UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN



RICHARD ROY VENDEVILLE,
Prison number: 206993,
Standish Maximum Correctional Facility,

                                    Petitioner,

vs.                                         Honorable J. Quist
                                            **Gordon J. Quist**
                                            **U.S. District Judge**
                                            Hugh W. Brenneman, Jr
THOMAS BIRKETT, Warden,                      U.S. Magistrate Judge
Standish Maximum Correctional Facility,

                                    Respondent.        Docket Number:

_____/    4:06 CV 0089

Attorney General of the State of Michigan: Mike Cox.
_____/


## MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR A WRIT OF HABEAS CORPUS


                    Richard Roy Vendeville, (206993)
                    Standish Maximum Correctional Facility
                    4713 West M-61
                    Standish, Michigan 48658

## TABLE OF CONTENTS

GROUNDS RAISED ---------------------------------------- -ii-

INDEX OF AUTHORITIES ------------------------------- -iii- thru -vi-

RELIEF REQUESTED -------------------------------------- -20-

## GROUNDS RAISED

### GROUND I

THE PETITIONER WAS DENIED A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHEN HE STOOD TRIAL BEFORE A JURY IN HANDCUFFS, BELLY CHAINS AND LEG IRONS.

Page —1—

### GROUND II

THE PETITIONER WAS DENIED A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHEN A PROSECUTION WITNESS WAS ALLOWED TO TESTIFY THAT THE PETITIONER HAD CONFESSED TO SIXTEEN TO TWENTY ADDITIONAL CRIMES THAT THE PETITIONER WAS NEVER CHARGED OR CONVICTED OF. THIS 1) CHILLED THE PRESUMPTION THAT THE PETITIONER WAS INNOCENCE, AND 2) LOWERED THE PROSECUTION'S BURDEN OF PROOF.

Page —8—

### GROUND III

THE PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS PURSUANT TO THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHEN THE TRIAL COURT 1) GAVE A JURY INSTRUCTION ON INTOXICATION WHEN NO INTOXICATION DEFENSE WAS EVER USED BY THE PETITIONER, AND 2) APPLIED A JURY INSTRUCTION ON A LAW IN A RETROACTIVE FASHION WHEN THE LAW WAS PERSPECTIVE ONLY.

Page —16—

## INDEX OF AUTHORITIES

**FEDERAL**                                                    **PAGES**

Bejjani v I.N.S.,
271 F3d 670 (CA 6, 2001) ------------------------- 18

Bouie v Columbia,
378 US 347; 84 S Ct 1697; 12 L Ed 2d 894 (1964) -- 18

Chambers v Mississippi,
410 US 284; 93 S Ct 1038; 35 L Ed 2d 297 (1973) -- 14

Davis v Alaska,
415 US 308; 94 S Ct 1105; 39 L Ed 2d 347 (1974) -- 14

Estella v McGuire,
502 US 62; 112 S Ct 475; 116 L Ed 2d 385 (1991) -- 8, 10

Eberhardt v Bordenkircher,
605 F2d 275 (CA 6, 1979) ------------------------- 13, 14

Hamilton v Vasquez,
882 F2d 1469 (CA 9, 1989) ------------------------ 7

In re Winship,
397 US 358; 90 S Ct 1068; 25 L Ed 2d 368 (1970) -- 12

Illinois v Allen,
397 US 337; 90 S t 1057; 25 L Ed 2d 353 (1970) --- 6

Ivan v City of New York,
406 US 203; 92 S Ct 1951; 32 L Ed 2d 659 (1972) -- 18

Kennedy v Cardwell,
487 F 2d 101 (CA 6, 1973) ------------------------ 6, 7

Krulewitch v United States,
336 US 440; 69 S Ct 716; 93 L Ed 790 (1949) ------ 15

Moore v Illinois,
408 US 786; 33 L Ed 2d 706; 92 S Ct 2562 (1972) -- 1

Michelson v United States,
335 US 469; 69 S Ct 213; 93 L Ed 168 (1948) ------ 10, 14

Mullaney v Wilbur,
421 US 687; 95 S Ct 1888; 44 L Ed 2d 508 (1975) -- 13, 14

# INDEX OF AUTHORITIES

**FEDERAL**                                                    **PAGES**


McGuire v Estelle,
902 F2d 749 (CA 9, 1990) -------------------------- 13

Mills v Maryland,
486 US 396; 108 S Ct 1860; 100 L Ed 2d 384 (1988) - 17

Patterson v New York,
432 US 197; 97 S Ct 2319; 53 L Ed 2d 281 (1977) --- 13, 14

Parker v Randolph,
442 US 62; 99 S Ct 2132; 60 L Ed 2d 713 (1979) ---- 17

Ralls v Manson,
375 F Supp 1271 (D Conn, 1975) -------------------- 7, 15

Rose v Clark,
478 US 570; 106 S Ct 3101; 92 L Ed 2d 460 (1986) -- 17

Ruimveld v Birkett,
404 F3d 1006 (CA 6, 2005) ------------------------- 1, 6

Townsend v Sain,
372 US 293; 83 S Ct 745; 9 L Ed 2d 770 (1963) ----- 6, 20

Sandstrom v Montana,
442 US 516; 99 S Ct 2450; 61 L Ed 2d 39 (1979) ---- 12

Sims v Stinson,
101 F Supp 2d 187 (SD NY, 2000) ------------------- 12, 13, 14

Spencer v Texas,
385 US 554; 87 S Ct 648; 17 L Ed 2d 606 (1967) ---- 10, 14

United States v Clarke,
227 F3d 874 (CA 7, 2000) -------------------------- 19

United States v Fosher,
568 F2d 207 (CA 1, 1978) -------------------------- 11, 14

United States v Harman,
349 F2d 316 (CA 4, 1965) -------------------------- 11, 14, 15

United States v Harrington,
490 F2d 487 (CA 2, 1973) -------------------------- 11

# INDEX OF AUTHORITIES

**FEDERAL**                                                              **PAGES**


United States v Reed,
376 F2d 226 (CA 7, 1867) ---------------------------- 13, 14

United States v Washington,
819 F2d 221 (CA 9, 1987) ---------------------------- 17

United States v Johnstone,
107 F3d 200 (CA 3, 1997) ---------------------------- 17

United States v Schneider,
14 F3d 876 (CA 3, 1994) ----------------------------- 17

United States v St. John,
92 F3d 761 (CA 8, 1996) ----------------------------- 18

United States v Varner,
748 F2d 925 (CA 4, 1984) ---------------------------- 19



**STATE**                                                                **PAGES**


People v Adam,
83 Mich App 326 (1978) ------------------------------ 11

People v Allen,
429 Mich 558 (1988) --------------------------------- 11, 13

People v Baldwin,
405 Mich 550 (1979) --------------------------------- 11

People v Camel,
11 Mich App 219 (1968) ------------------------------ 9

People v Faulkner,
389 Mich 682 (1973) --------------------------------- 8

People v Golochowicz,
413 Mich 298 (1982) --------------------------------- 8

People v Hawkins,
245 Mich App 439 (2001) ----------------------------- 9

People v Jackson,
391 Mich 323 (1974) --------------------------------- 8

# INDEX OF AUTHORITIES

**STATE**                                                          **PAGES**

People v Langworthy,
416 Mich 630 (1982) ------------------------------------ 17

People v McCarver,
87 Mich App 12 (1978) -------------------------------- 8

People v Maynor,
470 Mich 289 (2004) --------------------------------- 16

People v Osborn,
75 Mich App 600 (1977) ------------------------------ 9

People v Oliphant,
399 Mich 472 (1976) --------------------------------- 11

People v Rappuhn,
66 Mich App 17 (1975) ------------------------------- 11

People v Ernest Smith,
87 Mich App 18 (1978) ------------------------------- 8

People v Starr,
217 Mich App 646 (1996) ----------------------------- 10

People v Savoie,
419 Mich 118 (1984) --------------------------------- 17

People v Wilkens,
82 Mich App 260 (1978) ------------------------------ 11

People v Van Dorsten,
409 Mich 942 (1980) --------------------------------- 8

People v Van Wir,
17 Mich App 77 (1969) ------------------------------- 9


**MISCELLANEOUS**                                                  **PAGES**

Michigan Rules of Evidence 404(b)(2) ------------------ 14

MCLA 750.110(2); MSA 28.305(a) ------------------------ 16

MCLA 768.37 ------------------------------------------- 16, 18

Black's Law Dictionary -------------------------------- 18

Due Process Clause of the Fourteenth Amendment ------- 1, 8, 16

## GROUND I

**THE PETITIONER WAS DENIED A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHEN HE STOOD TRIAL BEFORE A JURY IN HANDCUFFS, BELLY CHAINS AND LEG IRONS.**

### FACTS[*]

At a pretrial hearing on April 3, 2003, defense counsel moved the trial court (court) to allow the Petitioner to be tried without being shackled in handcuffs, belly chains and leg irons (full shackles)[**] (SADO, 8).

Only one witness for the prosecution team[***] testified at this pretrial hearing regarding the Petitioner's alleged bizarre and hostile before-the-trial behavior. It was this testimony by Lieutenant Gail Sampsell (Lt. Sampsell) which would eventually lead the court to rule that the Petitioner would have to stand trial in full shackles.

---

[*] These facts are based upon the written briefs which were filed into the Michigan Court of Appeals by the defense appellate attorney, the prosecuting attorney and the Petitioner's pro per application for leave to appeal filed into the Michigan Supreme Court. The defense appellate attorney's brief was filed on January 26, 2004, by Douglas W. Baker of the State Appellate Defender Office which will be referred to as SADO, with the page(s) number(s) following the SADO term. The prosecuting attorney's brief was filed on February 26, 2004, by Heather S. Bergmann which will be referred to as PROSECUTOR, with the page(s) number(s) following that PROSECUTOR term. The Petitioner's pro per application to the Michigan Supreme Court was ruled on by that court on August 31, 2004. It will be referred to as PRO PER, with the page(s) number(s) following that PRO PER term. These facts are also based upon the opinion of the Michigan Court of Appeals dated November 9, 2004 (#24816) hereafter referred to as APPEALS, with the page(s) number(s) following that APPEALS term.

[**] The handcuffs, belly chains and leg irons will hereafter be referred to as "full shackles." Cf., Ruimveld v Birkett, 404 F3d 1006, 1009, fn 1 (CA 6, 2005).

[***] Moore v Illinois, 408 US 786; 33 L Ed 2d 706, 722; 92 S Ct 2562, 2576 (1972) (Police are a part of the "prosecution team").

-1-

Lt. Sampsell was a lieutenant at the Kalamazoo County Jail which was a division of the Kalamazoo County Sheriff's Department (SADO, 8; PROSECUTOR, 9, 11; APPEALS, -2-). She testified to each fact[*] (PROSECUTOR, 11) from complete memory, without the use of notes, reports or memoranda that the Petitioner:

1) Was "very demanding" (SADO, 8).

2) Was a "resource drain" (SADO, 8).

3) Was manipulative, destructive and violent (PROSECUTOR, 11).

4) Had taken a swing at an officer while pretending to be overdosing on medication (SADO, 8; PROSECUTOR, 12; APPEALS, -2-).

5) Had resisted officers and threatened to hurt specific staff members once he was released form his handcuffs (SADO, 8; PROSECUTOR, 12; APPEALS, -2-).

6) Had used profanity against jail staff (PROSECUTOR, 12).

7) Had to always be escorted by two guards and handcuffed behind his back wherever he went, even to and from the restroom (PROSECUTOR, 12).

---

[*] The Michigan Court of Appeals incorrectly stated that the trial court's decision to keep the Petitioner in full shackles was based upon Lt. Sampsell's testimony "and on other records of the defendant's behavior and mental state" (APPEALS, -2-). However, Lt. Sampsell did not testify from any "other records." Instead, she testified form complete memory without the use of any notes, reports or any other written matters.

-2-

8) Was caught hoarding small pieces of metal,[*] which in theory, might have been used as weapons or to pick or jam a lock, and on one occasion, had used such a piece of metal to jam his handcuffs shut (SADO, 8-9; PROSECUTOR, 11; APPEALS, -2-).

9) Had collected pieces of metal from a radiator and a phone coax at the jail (PROSECUTOR, 11; APPEALS, -2-).

10) Had tampered with transport vehicle door latches and collected ashtray springs and bits of metal from underneath the seats of transport vans[**] (SADO, 9; APPEALS, -2-).

11) Had asked a trustee to get him large metal staples from supply boxes (PROSECUTOR, 11; APPEALS, -2-).

12) Had tried to remove screws from items in the rehabilitation cell (PROSECUTOR, 12; APPEALS, -2-).

13) Had used the metal to jam doors (PROSECUTOR, 12; APPEALS, -2-).

14) Had removed items form the trustees cart (PROSECUTOR, 11).

15) Had removed a ceiling tile (PROSECUTOR, 11; APPEALS, -2-).

16) Had dismantled a light in the isolation area in an attempt to get metal (PROSECUTOR, 11; APPEALS, -2-).

17) Was seen tampering with the electricity (PROSECUTOR, 12; APPEALS, -2-).

---

[*] The small pieces of metal consisted of a pair of fingernail clippers and a needle. The fingernail clippers were handed out to inmates to use and then the jailer would pick them up when the prisoner had finished using them. The Petitioner's cell was shaken down after the jailer had given the Petitioner the nail clippers to use. The needle was used for making body tattoos (which many prisoners often do).

[**] There was no proof that the Petitioner had collected any of these items from the jail or the transport vans. These items could have been tampered with and hoarded by other inmates who had used the facilities before or after the Petitioner had.

Lt. Sampsell also testified:

18) That a search was conducted and pieces of metal were found sharpened down in the form of weapons (PROSECUTOR, 11; APPEALS, -2-).

Lt. Sampsell further testified that the Petitioner:

19) Was climbing the jail bars while making Tarsan yells, wrapping himself in urine-soaked toilet paper and placing his "bodily fluids and bodily substances" in "areas where officers could not avoid them" (SADO, 8; PROSECUTOR, 12; APPEALS, -2-).

20) Was unruly, physically aggressive and out of control when being transported (PROSECUTOR, 12).

21) Had threatened to hurt himself, and on one occasion, had "opened up both of his wrists to the point that he was actually puddling blood." The jail officials, therefore, considered him to be a suicide risk (SADO, 8; PROSECUTOR, 13; APPEALS, -2-).

22) Had often demanded to be taken to places such as the hospital or to forensics (PROSECUTOR, 12).

23) That psychologists who examined (or tried to examine) the Petitioner during forensic interviews regarding a possible insanity defense had concluded that he was malingering. On one occasion, while returning from a forensic interview, the Petitioner began rocking back and forth so uncontrollably in the back seat of a transport van that those transporting him feared that he would either hurt himself or break free and the Michigan State Police were summoned to provide an emergency escort (SADO, 9; APPEALS, -2-, -3-).

24) That three to four weeks before the trial, the Petitioner's behavior improved. He stopped collecting metal objects, and was now wearing regular jail uniforms instead of the "suicide gowns" that he formerly wore. But, on the morning of the hearing he caused another incident. At the jail, about to be transported to court, he insisted on being handcuffed a certain way by a certain jailer. When another jailer refused to accomodate him, he told the other jailer not to touch him and used his body weight to passively resist. Once handcuffed, he had to be carried from jail to the transport van. Lt. Sampsell assumed that, had the Petitioner not been cuffed, that the jailer would have been assaulted (SADO, 9-10; PROSECUTOR, 12; APPEALS, -2-, -3-).

25) That other prisoners reported that the Petitioner had escape plans (SADO, 8; PROSECUTOR, 11; APPEALS, -2-).

Although the court concluded that the Petitioner __was__ __not__ enough of a threat to courtroom decorum to warrant full shackles, the court nonetheless ruled that the Petitioner was a threat of injury to himself and others and an escape risk[*] (an escape risk that was based upon the inferred assertion that the Petitioner was manipulating an insanity defense so that he could exploit escape opportunities while being transported from one facility to another for his forensic interviews) (SADO, 10; PROSECUTOR, 13). Hence, the Petitioner had to remain in full shackles throughout his entire trial. These full shackles were constantly visible to the jury during the trial (SADO, 10, 13; PROSECUTOR, 9; APPEALS, -2-, -3-).

---

[*] What has __not__ been mentioned, either at the hearing on the full shackles, or in any of the SADO or PROSECUTOR appellate briefs filed into the Michigan Court of Appeals, was the fact that when the Petitioner was transported by transport van, not only was he in full shackles, but he was also fettered to the vehicle floor by an eight foot logging chain. Escape was virtually impossible (PRO PER, -4-).

## ARGUMENT

None of the alleged activities (of sub-paragraphs 1) through 25), supra) occurred at the trial. The Petitioner conducted himself in an orderly and fashionable manner.

It must be pointed out that all of the testimony by Lt. Sampsell regarding the Petitioner's before-the-trial behavior was based upon the purported reports that were prepared by others. Therefore, hearsay. Lt. Sampsell testified from complete memory. None of the jail personnel, forensic examiners or inmates who purportedly reported on the Petitioner's alleged pretrial activities (referred to in sub-paragraphs 1) through 25), supra) were called to testify. Therefore, an evidentiary hearing pursuant to Townsend v Sain, 372 US 293; 83 S Ct 745; 9 L Ed 2d 770 (1963) should be held in order to make a factual record on Lt. Sampsell's testimony to determine whether her on-stand statements concerning the Petitioner's purported pretrial behavior comports with the actual reports and records allegedly made by the jail personnel, forensic examiners and inmates, or whether her testimony was faulty. Cf., Kennedy v Cardwell, 487 F2d 101 (CA 6, 1973).

The United States Supreme Court has held that no defendant should be tried while shackled except as a last resort. Illinois v Allen, 397 US 337, 344; 90 S Ct 1057; 25 L Ed 2d 353 (1970).

Not only did the full shackles harm the Petitioner's presumption of innocence and create a substantially injurious inference of guilt, Ruimveld v Birkett, 404 F3d 1006, 1015, 1017 (CA 6, 2005), but when the judge ordered that the Petitioner be manacled in full shackles, the jury necessarily conceived a prejudice against the Petitioner as

-6-

being, in the opinion of the judge, a dangerous man, and not to be trusted, even under the surveillance of officers. <u>Kennedy</u> v <u>Cardwell</u>, 487 F2d 101, 106 (CA 6, 1973). It also suggested that the fact of his guilt was obvious:

> "[a defendant is] ordinarily entitled to be relieved of handcuffs, or other unusual restraints, so as not to mark him as an obviously bad man or to suggest that the fact of his guilt is a foregone conclusion." <u>Hamilton</u> v <u>Vasquez</u>, 882 F2d 1469, 1471 (CA 9, 1989).

This "dangerous" and "bad man" brand was especially harmful in this case because, not only was the Petitioner manacled in handcuffs, but in belly chains and leg irons. Therefore, the handcuffs were compounded by the belly chains, and the handcuffs and belly chains were compounded by the leg irons.

Even though the court gave a cautionary instruction (APPEALS, -3-), this did little to cure the jury's constant views of the Petitioner in full shackles when he sat at the defense table, when he stood for the jury, when he took the witness stand, and on more than one occasion, when he was led by the jury outside the courtroom (SADO, 10-13; APPEALS, -3-).[*]

The jury instruction, if anything, only highlighted the full shackles, and re-emphasized the "dangerous man" viewpoint, without erasing the "bad man" perspective ink stain. Cf., <u>Ralls</u> v <u>Manson</u>, 375 F Supp 1271, 1289 (D Conn, 1975) (It is pure fiction to think that a cautionary instruction by the trial judge can erase the ink stain of prejudice).

---

[*] See also the Michigan Court of Appeals <u>Motion To Remand</u> dated January 27, 2004, filed by SADO. The prosecution admitted that the shackles were visible to the jury. See <u>Answer Opposing Defendant's Motion To Remand</u>, filed in the Michigan Court of Appeals dated February 10, 2004.

-7-

## GROUND II

THE PETITIONER WAS DENIED A FAIR AND IMPARTIAL TRIAL IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WHEN A PROSECUTION WITNESS WAS ALLOWED TO TESTIFY THAT THE PETITIONER HAD CONFESSED TO SIXTEEN TO TWENTY ADDITIONAL CRIMES THAT THE PETITIONER WAS NEVER CHARGED OR CONVICTED OF. THIS 1) CHILLED THE PRESUMPTION THAT THE PETITIONER WAS INNOCENT, AND 2) LOWERED THE PROSECUTION'S BURDEN OF PROOF.

## FACTS

During the trial, Detective Sergeant Donald Ester (Sgt. Ester) of the Kalamazoo Police Department was allowed to testify that the Petitioner had confessed to sixteen to twenty additional breaking and crimes (bad acts),[*] aside from the crime that he stood trial on (SADO, 15-21; PROSECUTOR, 17-20; APPEALS, -3-, -4-). None of these purported confessions were recorded, reduced to writing, video taped, signed or reviewed by the Petitioner.[**] (SADO, 15; PROSECUTOR, 18; APPEALS, -3-).

---

[*]  In Michigan, prior or other criminal acts evidence are known as "bad acts." People v Ernest Smith, 87 Mich App 18-19, 22-23, 25 (1978). The United States Supreme Court has also termed prior criminal behavior as "bad acts." Estell v McGuire, 502 US 62, 72; 112 S Ct 475, 482; 116 L Ed 2d 385 (1991). Hence, the term "bad acts" will be used throughout this argument.

[**]  The Michigan courts have had to decide what "bad acts" are, and when they are allowable, and when they are not. They have had to decide cases where the defendant has had prior convictions, People v Jackson, 391 Mich 323, 332-336 (1974), only charged with a crime, People v McCarver, 87 Mich App 12 (1978), not convicted of the crime, People v Faulkner, 389 Mich 682, 695 (1973), unnamed prior felonies, People v Van Dorsten, 409 Mich 942 (1980), or no proof that the bad acts were actually perpetrated, People v Golochowicz, 413 Mich 298 (1982).

On more than one occasion, defense counsel objected to Sgt. Ester's other bad acts testimony, and each time, the court overruled the objection (SADO 15-16). The prosecutor argued that the court's ruling was correct because the defense had "opened the door" when it claimed that none of the other bad acts were recorded. This, according to the prosecutor, allowed rule 404(b)(2) of the Michigan Rules of Evidence (MRE) to be skirted[*] (SADO, 17, 19-20; PROSECUTOR, 17, 19; APPEALS, -3-; PRO PER, -6-). The prosecutor gave no notice[**] that he intended to offer any other bad acts in violation of MRE 404(b)(2) (SADO, 15, 17-18; PROSECUTOR, 18; APPEALS, -3-; PRO PER, -6-).

The other bad acts were highlighted in the prosecutor's summation to the jury (SADO, 17), and they were further compounded when the court gave instructions[***] on the bad acts behavior (SADO, 17; PROSECUTOR, 19; APPEALS, -4-).

---

[*]  Michigan has a long history of using bad acts against a defendant, either directly or indirectly. f., People v Camel, 11 Mich App 219, 220 (1968); People v Van Wir, 17 Mich App 77 (1969); People v Rappuhn, 66 Mich App 17 (1975); People v Osborn, 75 Mich App 600 (1977).

[**]  MRE 404(b)(2) requires that a prosecutor must give notice in advance of the trial, of his intent to use a defendant's bad acts. A trial court may excuse pretrial notice for good cause. People v Hawkins, 245 Mich App 439, 453 (2001).

[***]  The trial court gave the jury limited instructions during the trial concerning the bad acts, however, in the final instructions, the court merely referred to his mid-trial instructions without repeating them (SADO, 17).

## ARGUMENT

The Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits the improper admission and use of bad acts evidence in criminal proceedings. This constitutional principle has been reaffirmed by both the Michigan[*] and federal courts. Estella v McGuire, 502 US 62, 70; 112 S Ct 475, 481; 116 L Ed 2d 385 (1991).

The reason that the federal courts have frowned upon the improper use of bad acts as prejudicial is because it makes it difficult for a defendant to defend against the charges that he is on trial for. Michelson v United States, 335 US 469, 475-476; 69 S Ct 213, 218; 93 L Ed 168 (1948):

> "The inquiry [of bad acts] is not rejected because character is irrelevant; on the contrary, it is said to weigh to much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge."

Since the time of Michelson, supra, the federal courts have continued to hold that the improper use of a criminal defendant's prior bad acts is prejudicial.

In Spencer v Texas, 385 US 554, 560; 87 S Ct 648, 652; 17 L Ed 2d 606 (1967), the Supreme Court stated:

> "The rules concerning evidence of prior offenses are complex, and vary from jurisdiction to jurisdiction, but they can be summarized broadly. Because such evidence is generally recognized to have potentiality for prejudice, it is usually excluded except when it is particularly probative in showing such things as intent."

---

[*] People v Starr, 217 Mich App 646, 648 (1996) (Improper admission of bad acts may constitute a due process violation).

In __United States__ v __Fosher__, 568 F2d 207, 212 (CA 1, 1978), the court opined:

> "Thus a jury is required to determine a defendant's guilt or innocence of the crime charged solely on the basis of evidence relevant to that particular crime. A conviction should not be permitted because the jury believes the defendant to b a person of bad character or because of a notion that since he committed some other crime, he must also have committed the crime for which he is being tried."

The general consensus throughout the federal courts[*] is that the improper use of bad acts evidence is highly prejudicial and should not be allowed. __United States__ v __Harman__, 349 F2d 316, 320 (CA 4, 1965) (A criminal defendant's prior bad acts, which are not charged in the information, are inadmissible as evidence because they make it highly detrimental to the defendant's chances of an acquittal). __United States__ v __Harrington__, 490 F2d 487, 490 (CA 2, 1973) (If a defendant has not himself been responsible for causing the jury to be informed about his previous convictions, he is entitled to have the existence of any prior criminal record concealed from the jury).

---

[*] The Michigan courts have also considered the prejudicial effect of bad acts. __People__ v __Rappuhn__, 66 Mich App 17 (1975). ad acts make a defendant look like a "bad man," __People__ v __Oliphant__, 399 Mich 472 (1976), and because "he is [looked upon as] a bad man," __People__ v __Wilkens__, 82 Mich App 260, 265 (1978), the jury may fell that the defendant should be punished, even though the charge that he is on trial for is in doubt. __People__ v __Allen__, 429 Mich 558, 569 (1988).

In addition to the jury's use of the bad acts to determine guilt of the charged offense, __People__ v __Baldwin__, 405 Mich 550 (1979), the bad acts may prevent them from an objective determination of the disputed factual issues. __People__ v __Adam__, 83 Mich App 326, 331 (1978). The fact-finder may feel that, since the defendant has a propensity to commit crimes, he must therefore be guilty of the crime that he is standing trial for. __People__ v __Allen__, __supra__, at 569.

In _Sims_ v _Stinson_, 101 F Supp 2d, 187, 196 (SD NY, 2000) (citing _Spencer_ v _Texas_, _supra_), the court held that it is:

> "well established that evidence of prior convictions may not be used by the State to show that the accused has a criminal disposition and that the probability that he committed the crime currently charged is increased and that nothing in the majority opinion implied that it would be consistent with due process [to admit] prior-crimes evidence for no purpose other than what probative value it has bearing on an accused's disposition to commit a crime currently charged."

The _Sims_ court went on to say that it was the use of _suspicious acts_ that the Constitution was designed to prevent:

> "such inferences from criminal or suspicious acts to propensity to commit the crimes charged are precisely what the traditional ban on character evidence is designed to prevent." _Sims_, _supra_, at 197-198.

Not only did the improper use of the _suspicious_ bad acts in this case make the Petitioner look like a "bad man" in front of the jury, but their use also: 1) chilled the presumption that the Petitioner was innocent of the charge for which he stood trial for, and 2) lowered the prosecution's burden of proof.

## PRESUMPTION OF INNOCENCE

The presumption of innocence principles are protected by the Due Process Clause of the Fourteenth Amendment. _Sandstrom_ v _Montana_, 442 US 516; 99 S Ct 2450; 61 L Ed 2d 39 (1979). This principle is not only elementary, but enforceable upon the states. _In re Winship_, 397 US 358; 90 S Ct 1068; 25 L Ed 2d 368 (1970). In _Winship_, the court held that the:

> "[a]ccused is presumed to be innocent and such presumption is an axiomatic and elementary principle, enforcement of which lies at the foundation of the administration of criminal law."

-12-

When bad acts are improperly used against a defendant, it vitiates a defendant's right to be presumed innocent until proven guilty. United States v Reed, 376 F2d 226, 228 (CA 7, 1967). Cf., Eberhardt v Bordenkircher, 605 F2d 275, 280 (CA 6, 1979) (The use of bad acts is strongly condemned because it effectively eliminates the presumption of innocence).

## BURDEN OF PROOF

It is a well established due process tenet that the burden of proof[*] is upon the prosecution throughout the trial, i.e., the prosecution has the burden of proving the defendant guilty, and that burden does not shift to the defendant. Patterson v New York, 432 US 197, 210; 97 S Ct 2319; 53 L Ed 2d 281 (1977); Mullaney v Wilbur, 421 US 687; 95 S Ct 1888, 1891; 44 L Ed 2d 508 (1975).

## PREJUDICE

Was the Petitioner prejudiced by the improper use of the bad acts? The answer must be an unequivocal yes.

First, the Petitioner was never charged or convicted of any of the bad acts. Cf., McGuire v Estelle, 902 F2d 749, 754 (CA 9, 1990). The bad acts used at his trial were merely suspicious acts. Sims v Stinson, supra, at 197-198.

---

[*] This bad acts burden of proof principle has been recognized by the Michigan courts as well. People v Allen, 429 Mich 558, 569 (1988) (The use of bad acts may lead the jury to lower the burden of proof against the defendant).

-13-

Second, the use of the bad acts gave the impression ("inferences") that the Petitioner had committed similar crimes in the past or was the type of person who would commit such crimes. <u>Sims</u> v <u>Stinson</u>, <u>supra</u>, at 197.

Third, the bad acts overpersuaded the jury that the Petitioner obviously had "a bad general record." <u>Michelson</u> v <u>United States</u>, <u>supra</u>, at 335 US at 475-476; 69 S Ct at 218.

Fourth, they could not have been used, but were, to establish "intent." <u>Spencer</u> v <u>Texas</u>, <u>supra</u>, at 385 US at 560; 87 S Ct at 652.

Fifth, the bad acts made the Petitioner look like "a person of bad character." <u>United States</u> v <u>Fosher</u>, <u>supra</u>, at 212.

Sixth, the bad acts made "it highly detrimental to the [Petitioner's] chances of an acquittal." <u>United States</u> v <u>Harman</u>, <u>supra</u>, at 320.

Seventh, the bad acts chilled the Petitioner's presumption of innocence. <u>United States</u> v <u>Reed</u>, <u>supra</u>, at 228; <u>Eberhardt</u> v <u>Bordenkircher</u>, <u>supra</u>, at 280.

Eighth, the bad acts relieved the prosecution of his burden of proof. The prosecutor used the bad acts as additional weight to stack upon the charge that the Petitioner stood trial for. Cf., <u>Patterson</u> v <u>New York</u>, <u>supra</u>; <u>Mullaney</u> v <u>Wilbur</u>, <u>supra</u>.

The prosecution openly admitted that he never gave the proper notice (<u>MRE</u> 404(b)(2)[*] that he intended to use the unsubstantial bad

_____

[*] The Michigan Rules of Evidence (<u>MRE</u>) cannot stand in the way of the United States Constitution. Cf., <u>Chambers</u> v <u>Mississippi</u>, 410 US 284; 93 S Ct 1038; 35 L Ed 2d 297 (1973); <u>Davis</u> v <u>Alaska</u>, 415 US 308; 94 S Ct 1105; 39 L Ed 2d 347 (1974).

-14-

acts as evidence, but justified the no-notice use on the grounds that the defense had "opened the door," when Sgt. Esters was questioned as to why none of the purported confessions allegedly made by the Petitioner were recorded, reduced to writing, video tamped, signed, or even reviewed by the Petitioner (PROSECUTOR, 18-19). This was a clever ruse used in order to have Sgt. Ester imply that the Petitioner had prior bad acts and was therefore, a bad man.

The prosecutor somehow felt that, because the trial court gave limited instructions to the jurors about the bad acts, that this somehow erased the ink stain (PROSECUTOR, 19-20). However, it "is doubtful that anything the judge might have said could have removed the prejudice created by the bad acts." United States v Harman, 349 F2d 316, 320 (CA 4, 1965). Cf., Ralls v Manson, 375 F Supp 1271, 1289 (D Conn, 1974) (citing Krulewitch v United States, 336 US 440, 453; 69 S Ct 716, 723; 93 L Ed 790 (1949)):

> "The naive assumption that prejudicial effects [by the use of bad acts] can be overcome by instructions to the jury ..., all practicing lawyers know to be unmitigated fiction."

-15-

## GROUND THREE

THE PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO
DUE PROCESS PURSUANT TO THE FOURTEENTH AMENDMENT OF THE
UNITED STATES CONSTITUTION WHEN THE TRIAL COURT 1) GAVE
A JURY INSTRUCTION ON INTOXICATION WHEN NO INTOXICATION
DEFENSE WAS EVER USED BY THE PETITIONER, AND 2) APPLIED
A JURY INSTRUCTION ON A LAW IN A RETROACTIVE FASHION WHEN
THE LAW WAS PERSPECTIVE ONLY.

## FACTS

The Petitioner was charged and convicted of first-degree home
invasion,[*] which is a specific-intent crime. The Petitioner testified
that in the weeks before, and the days after the offense, he was
"binging" on alcohol and drugs, making him paranoid and delusional
(SADO, 23). The Petitioner further testified that he had no idea how
some of the proceeds of the crime came to be among his belongings,
saying "I don't know that I did it myself" (SADO, 23).

The prosecution asked for an instruction that intoxication is
not a defense to any crime, not even a specific-intent crime. Defense
counsel objected, noting that the defense had not formally raised
an intoxication defense. The trial judge overruled the objection and
gave the instruction, even though the judge explicitly acknowledged
that the new law abolishing intoxication as a defense to specific-
intent crimes did not apply to cases such as this one that occurred
prior to September 1, 2002 (SADO, 23).[**]

---

[*]  MCLA 750.110(2); MSA 28. 305(a).

[**]  The statute under discussion is MCLA 768.37, i.e., People
v Maynor, 470 Mich 289, 296 (2004). This enactment abolished
intoxication as a defense to specific-intent crimes, but only those
crimes that occurred after September 1, 2002.

-16-

## ARGUMENT

Jury instructions fall under the Due Process Clause of the Fourteenth Amendment of the United States Constitution. <u>Rose</u> v <u>Clark</u>, 478 US 570, 589; 106 S Ct 3101, 3112; 92 L Ed 2d 460 (1986); <u>Parker</u> v <u>Randolph</u>, 442 US 62; 99 S Ct 2132; 60 L Ed 2d 713 (1979). Cf., <u>Mills</u> v <u>Maryland</u>, 486 US 396; 108 S Ct 1860; 100 L Ed 2d 384 (1988) (Incorrect jury instructions violates due process of law under the Fourteenth Amendment).

When the trial court instructed the jury that it could not consider the Petitioner's voluntary intoxication when determining whether he had the specific intent necessary to commit first-degree home invasion, it violated the Petitioner's constitutional rights to due process of law in several ways:

First, a conviction cannot rest on an ambiguous and equivocal jury instruction on a basic issue. <u>United States</u> v <u>Washington</u>, 819 F2d 221, 26 (CA 9, 1987). Whether the statute in this case allowed or disallowed the instruction was a "basic issue" since the trial court could not instruct the jury that voluntary intoxication was not a defense to the first-degree home invasion.

Second, a jury instruction must clearly articulate the "relevant legal standard." It must, therefore, be structured in such a way as to avoid confusing or misleading the jury. <u>United States</u> v <u>Johnstone</u>, 107 F3d 200 (CA 3, 1997); <u>United States</u> v <u>Schneider</u>, 14 F3d 876, 881 (CA 3, 1994). In the Petitioner's case, the "relevant legal standard" was that the Petitioner could have sought a jury instruction which stated that voluntary intoxication could be considered in determining whether he had the specific-intent needed to make him guilty of the specific-intent crime of first-degree home invasion."[*]

---

[*] <u>People</u> v <u>Langworthy</u>, 416 Mich 630  637-638 (1982); <u>People</u> v <u>Savoie</u>, 419 Mich 118, 134 (1984).

Third, a statute may not be applied retroactively[*] absent a clear indication from the legislature that it intended such a result. Bejjani v I.N.S., 271 F3d 670 (CA 6, 2001). This is exactly what the court in this case did. It applied the statute MCLA 768.37 retroactively. Cf., Ivan v City of New York, 406 US 203; 92 S Ct 1951; 32 L Ed 2d 659 (1972). The Michigan Legislature was quite clear in their intent regarding MCLA 768.37. Their intent was that when this statute became effective on September 1, 2002, it would apply only to crimes committed on or after September 1, 2002. This was well after the Petitioner's arrest for the first-degree home invasion.

Fourth, the Due Process Clause of the Fourteenth Amendment supplies criminal defendants with the protection against "novel" developments in judicial doctrine. Bouie v Columbia, 378 US 347; 84 S Ct 1697; 12 L Ed 2d 894 (1964). What the trial court did in this case was "novel" for two reasons:

(1) The Petitioner never raised an intoxication defense. Therefore, without such a defense, the court could not give the  instruction that the jury could not consider the Petitioner's voluntary intoxication when determining whether he had the specific intent necessary to commit the first-degree home invasion.

(2) As noted above, the court could not make the statute MCLA 768.37 retroactive because the Legislature held that it would be prospective in nature starting on September 1, 2002, and dates thereafter.

_____

    * When the trial judge made MCLA 768.37 retroactive, it not only violated the retroactive legal principle, but also violated the Ex Post Facto law. An Ex Post Facto law is: "A law that applies retroactively [especially], in a way that negatively affects a person's rights, as by criminalizing an action that was legal when it was committed. Ex Post Facto criminal laws are prohibited by the Constitution." (Article I, § 9 and Article I, § 10 of the United States Constitution). Black's Law Dictionary. Cf., United States v St. John, 92 F3d 761 (CA 8, 1996).

-18-

## PREJUDICE

It is probable that the jury was unable to follow the court's instruction in this case, United States v Clarke, 227 F3d 874 (CA 7, 2000), because the Petitioner testified that he had been "binging" on drugs, before and after the offense, which made him paranoid sand delusional. Though the Petitioner did not specifically raise a defense of intoxication, the jury would likely have wondered whether the Petitioner could have formed the specific intent necessary to commit the crime of first-degree home invasion. That possibility was snuffed out, however, when the trial judge, on a motion of the prosecutor, instructed the jury that voluntary intoxication is not a defense, even to a specific-intent crime. This was a confusing instruction, and one that was an incorrect statement of law and was clearly prejudicial. It is logical that the jury followed this erroneous instruction. United States v Varner, 748 F2d 925 (CA 4, 1984).

## RELIEF REQUESTED

WHEREFORE, for all the foregoing reasons, the Petitioner requests:

1. That a writ of habeas corpus issue, or in the alternative;

2. That an evidentiary hearing pursuant to <u>Townsend</u> v <u>Sain</u>, 372 US 293; 83 S Ct 745; 9 L Ed 2d 770 (1963), be held regarding the issues within this habeas corpus petition.

3. That after the evidentiary hearing, that a writ of habeas corpus be issued.

4. That the court grant the Petitioner any further relief as justice and law requires.


Respectfully Submitted.

*Richard Roy Vendeville*

Richard Roy Vendeville, (206993)
Standish Maximum Correctional Facility
4713 West M-61
Standish, Michigan 48658

July __25__, 2006.

-20-